# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| DAWN NICHOLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV 1387 SNLJ(LMB) |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Dawn Nicholson for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 15). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On February 27, 2008, plaintiff filed her application for benefits, claiming that she became

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

unable to work due to her disabling condition on September 1, 2004. (Tr. 145-49). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ) dated January 24, 2011. (Tr. 71-75, 12-20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 8, 2012. (Tr. 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on April 1, 2010. (Tr. 46). Plaintiff was present and was represented by counsel. (<u>Id.</u>).

Plaintiff's attorney examined plaintiff, who testified that she was forty-one years of age, was five-feet, two-inches tall, and weighed 160 pounds. (Tr. 47).

Plaintiff stated that she attended college for approximately two years. (<u>Id.</u>). Plaintiff testified that she took general courses. (<u>Id.</u>). Plaintiff stated that she also received a certified nurse's aide ("CNA") license in 1995. (Tr. 48). Plaintiff testified that her CNA license was no longer valid. (<u>Id.</u>).

Plaintiff stated that she last worked in 2006. (<u>Id.</u>). Plaintiff testified that she baby-sat for relatives' children part-time. (<u>Id.</u>). Plaintiff stated that she also baby-sat for relatives' children on a part-time basis in 2003 and 2004. (<u>Id.</u>).

Plaintiff testified that she worked as a substitute teacher for a variety of school districts prior to baby-sitting. (Tr. 49). Plaintiff stated that she gave the children assignments, tried to

assist them, and supervised them.  (Id.).

Plaintiff testified that she worked for the Butler County Health Department in 1996 and 1997.  (Id.).  Plaintiff stated that she did laundry, dishes, housework, and shopped for groceries at this position.  (Id.).

Plaintiff testified that she worked for Clark's Mountain Home, a nursing home, for approximately four months prior to working for the health department.  (Tr. 50).  Plaintiff stated that she did not lift patients at this position, although she helped them get into wheelchairs.  (Id.).

Plaintiff testified that she worked for Duncan Ready-Mixed Concrete for five months in 1995.  (Id.).  Plaintiff stated that this was a temporary job.  (Id.).  Plaintiff testified that she answered the phones, took messages, filed papers, and mailed statements at this position.  (Id.).

Plaintiff stated that she worked for Nu-Dell Manufacturing making picture frames prior to working for Duncan.  (Tr. 51).  Plaintiff testified that she did a combination of standing and sitting at this position, and she did not have to do any heavy lifting.  (Id.).

Plaintiff testified that she has had problems with fibromyalgia[2] for about eight years, and that it has been getting worse each year.  (Id.).  Plaintiff stated that she did not seek treatment for a long time because she did not have insurance and did not have the ability to pay for treatment. (Tr. 52).

Plaintiff testified that she first saw a doctor at Parkland Health Center, who referred her to Dr. Maria Vintimilla.  (Id.).  Plaintiff stated that Dr. Vintimilla took x-rays and prescribed

---

[2]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution.  Additionally, point tenderness must be found in at least 11 of 18 specified sites.  Stedman's Medical Dictionary, 570 (28th Ed. 2006).

medications.  (Id.).  Plaintiff testified that the medications were not effective and caused side effects.  (Id.).  Plaintiff stated that Dr. Vintimilla referred her to a pain specialist, but she did not see the pain specialist due to an inability to afford treatment.  (Id.).  Plaintiff testified that she was also unable to participate in water exercise due to the cost.  (Id.).

Plaintiff stated that she had been seeing Dr. Rustico Ramos once or twice a month until one month prior to the hearing.  (Tr. 53).  Plaintiff testified that she stopped seeing Dr. Ramos because she believed he was not listening to her complaints.  (Id.).  Plaintiff stated that Dr. Ramos prescribed different medications, and suggested that plaintiff was seeking pain medication when she was not.  (Id.).

Plaintiff testified that she was still experiencing pain from fibromyalgia.  (Id.).  Plaintiff stated that she experiences pain everywhere, from her head to her feet.  (Tr. 54).  Plaintiff testified that she also experiences migraines and chest pain.  (Id.).  Plaintiff stated that she has undergone testing for her chest pain, which was normal.  (Id.).

Plaintiff testified that her pain is constant, and is worsened with increased activity and prolonged sitting.  (Id.).  Plaintiff stated that she tries to breathe deeply when she experiences chest pain, which helps somewhat.  (Id.).

Plaintiff testified that she also suffers from irritable bowel syndrome ("IBS").[3]  (Tr. 55).  Plaintiff stated that she experiences stomach pain, migraines, diarrhea, and breaks out in hives due to the IBS.  (Id.).  Plaintiff testified that she has diarrhea, which occurs up to seven to eight times a day.  (Id.).  Plaintiff stated that she also experiences urgency with her diarrhea, which keeps her

---

[3]A condition characterized by gastrointestinal signs and symptoms including constipation, diarrhea, gas, and boating, all in the absence of organic pathology.  Stedman's at 1902.

close to a restroom.  (Id.).  Plaintiff stated that she takes Zantac[4] for her IBS, which helps somewhat.  (Id.).

Plaintiff testified that her energy level has been really low.  (Tr. 56).  Plaintiff stated that she has been tired, weak, nauseous, and dizzy.  (Id.).

Plaintiff testified that she experiences depression "somewhat."  (Id.).  Plaintiff stated that she feels down and helpless daily, and has difficulty focusing.  (Id.).  Plaintiff testified that she does not sleep well.  (Id.).

Plaintiff stated that she does not get out much.  (Tr. 57).  Plaintiff stated that she sees her sister and her daughter once a week, goes to the store about once a week, and sees her mother about every two weeks.  (Id.).

Plaintiff testified that she has difficulty completing tasks.  (Id.).

Plaintiff stated that she does not handle stress well.  (Id.).  Plaintiff testified that she becomes overwhelmed and has difficulty breathing when she worries about things such as her daughter's college applications.  (Id.).  Plaintiff stated that she worries all the time.  (Tr. 58).

Plaintiff testified that her migraines have increased in frequency from once a week to two to three times a week.  (Id.).  Plaintiff stated that she has to lie down in a quiet room with the lights out when she has a migraine.  (Id.).  Plaintiff testified that the migraines last between four and eight hours.  (Id.).  Plaintiff stated that she has experienced nausea and vomiting with migraines.  (Tr. 59).

Plaintiff testified that she attended physical therapy for her neck the year prior to the

---

[4]Zantac is indicated for the treatment of GERD.  See Physician's Desk Reference ("PDR"), 1672 (63rd Ed. 2009).

hearing.  (Id.).  Plaintiff stated that the physical therapy helped her pain somewhat but only temporarily.  (Id.).  Plaintiff testified that the physical therapist recommended home exercises, but they did not help.  (Tr. 60).

Plaintiff stated that she seldom drives because she becomes nervous in traffic and when around people.  (Id.).  Plaintiff testified that she last drove three weeks prior to the hearing.  (Id.).

Plaintiff stated that she is only able to walk for about one block.  (Id.).  Plaintiff testified that she is able to stand for ten to fifteen minutes before she has to sit down.  (Tr. 61).  Plaintiff stated that she is able to sit for about thirty minutes before she has to move around.  (Id.). Plaintiff testified that the most comfortable positions for her are sitting in the recliner and lying down.  (Id.).  Plaintiff stated that she is able to lift and carry about eight pounds.  (Id.).  Plaintiff testified that she has difficulty bending and stooping.  (Tr. 62).

Plaintiff testified that she lives with her ex-husband, who is helping her financially.  (Id.). Plaintiff stated that she helps with the laundry, dishes, and dusting.  (Id.).  Plaintiff testified that her daughter does the mopping, vacuuming, and heavier household chores.  (Id.).  Plaintiff stated that she goes grocery shopping with her daughter.  (Id.).

Plaintiff testified that she is no longer active with church, or any clubs or organizations. (Tr. 63).  Plaintiff stated that it had been five years since she had been to church.  (Id.).  Plaintiff testified that she has no hobbies other than watching television, and occasionally playing card games with her daughter.  (Id.).

Plaintiff testified that she tries to get up by 10:00 a.m. to move around, and eat breakfast. (Id.).  Plaintiff stated that she then sits down in the recliner.  (Id.).  Plaintiff testified that she spends a total of five to six hours during the eight-hour period after she wakes in the morning

either sitting in the recliner or lying down. (Tr. 64). Plaintiff stated that she is unable to make it

through the day without lying down or resting, and that this had been the case for the past three

years. (Id.).

Plaintiff testified that she does not have Medicaid benefits. (Tr. 65). Plaintiff stated that

her Medicaid benefits were discontinued one month prior to the hearing. (Id.). Plaintiff testified

that she is not able to afford her medications. (Id.).

The ALJ examined plaintiff, who testified that she lost her Medicaid benefits when her

daughter turned eighteen. (Id.). Plaintiff stated that she is trying to get her benefits reinstated.

(Tr. 66).

Plaintiff testified that she never received unemployment. (Id.). Plaintiff stated that she

was divorced in 2007 or 2008. (Id.).

## B.    **Relevant Medical Records**

Plaintiff presented to Parkland Health Center-Farmington on August 4, 2005, with

complaints of right neck and shoulder pain. (Tr. 338). Plaintiff underwent x-rays of the cervical

spine, which were normal. (Tr. 343). Plaintiff was diagnosed with shoulder and neck strain. (Tr.

339).

On October 1, 2007, plaintiff presented to Maria Vintimilla, M.D. with complaints of pain

all over her body, including chest pains and headaches. (Tr. 291). Dr. Vintimilla listed the

following as "inactive problems:" recurrent urinary tract infections, IBS, GERD,[5] and panic

---

[5]Gastroesophageal reflux disease ("GERD"), is a syndrome due to structural or functional
incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric
juice into the esophagus. Stedman's at 556.

disorder.[6]  (Id.).  Plaintiff also reported difficulty sleeping.  (Id.).  Upon examination, Dr. Vintimilla noted multiple tender points, but no swelling.  (Tr. 291-92).  Dr. Vintimilla diagnosed plaintiff with fibromyalgia.  (Tr. 292).  She prescribed Flexeril[7] and Naproxen,[8] and explained to plaintiff the importance of aerobic exercise.  (Id.).

On November 6, 2007, plaintiff reported that the Naproxen was helping with her pain, but it was not enough.  (Tr. 289).  Plaintiff's main pain was in her upper back, neck, and a tingling sensation in the bilateral upper extremities.  (Id.).  Dr. Vintimilla diagnosed plaintiff with fibromyalgia with multiple tender and tense muscle groups; neck pain; and neuropathy.[9]  (Tr. 290).  She continued plaintiff on her medications and added Neurontin.[10]  (Id.).  Dr. Vintimilla also ordered x-rays.  (Id.).

On November 20, 2007, plaintiff reported that she was taking Flexeril only at night because it made her drowsy, and she was unable to tolerate the Neurontin.  (Tr. 287).  Dr. Vintimilla indicated that plaintiff had undergone x-rays of the cervical spine and hands, which were negative.  (Tr. 288).  Dr. Vintimilla diagnosed plaintiff with fibromyalgia (multiple tender and tense muscle groups), and allergies (skin rash).  (Id.).  Dr. Vintimilla prescribed

---

[6]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[7]Flexeril is indicated for the treatment of muscle spasms.  See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

[8]Naproxen is a nonsteroidal anti-inflammatory drug indicated for the relief of osteoarthritis.  See PDR at 2633.

[9]A classic term for any disorder affecting any segment of the nervous system.  Stedman's at 1313.

[10]Neurontin is indicated for the treatment of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

Amitriptyline,[11] Naproxen, and Loratadine.[12]  (Id.).

Plaintiff presented to Barnes Jewish Clinic for a health risk screening.  (Tr. 269).  Plaintiff reported that she had no difficulty walking, getting dressed, bathing, or performing activities of daily living, including cooking, cleaning, shopping, and driving.  (Id.).  Plaintiff complained of lower abdominal pain and urinary frequency.  (Tr. 270).  Plaintiff was prescribed medication for urinary frequency, and additional testing was recommended for plaintiff's pelvic pain.  (Tr. 271-72).

On December 11, 2007, plaintiff reported that the Amitriptyline was too high for her, the Naproxen was helping just a little with the pain, and she complained of stomach upset due to the Naproxen.  (Tr. 285).  Dr. Vintimilla's assessment was fibromyalgia (multiple tender and tense muscle groups), and gastritis.[13]  (Tr. 286).  She decreased plaintiff's Amitriptyline, and added Zantac.  (Id.).

On February 8, 2008, plaintiff reported that she had been under a lot of stress and had been having chest pains more frequently.  (Tr. 283).  Dr. Vintimilla adjusted plaintiff's medications and prescribed Mobic.[14]  (Tr. 284).

On March 10, 2008, plaintiff complained that the Mobic was not helping and was causing

---

[11]Amitriptyline is an antidepressant indicated for the treatment of mood disorders and nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

[12]Loratadine is an antihistamine indicated for the treatment of allergies.  See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

[13]Inflammation of the stomach.  Stedman's at 790.

[14]Mobic is a nonsteroidal anti-inflammatory drug indicated for the relief of symptoms of arthritis.  See PDR at 865.

nausea and stomach aches. (Tr. 328). Dr. Vintimilla stopped Mobic, and prescribed Zanaflex.[15] (Tr. 329).

On March 14, 2008, plaintiff reported that she could not take Zanaflex due to gastrointestinal upset and drowsiness, and that she was experiencing a lot of pain "all over her body." (Tr. 331). Dr. Vintimilla stopped the Zanaflex, and prescribed Lyrica[16] and Omeprazole.[17] (Tr. 332).

Joan Singer, PhD, a state agency psychologist, completed a Psychiatric Review Technique on May 20, 2008, in which she expressed the opinion that plaintiff's impairments were not severe and caused only mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. (Tr. 307, 315).

On May 29, 2008, plaintiff reported that she had stopped taking Lyrica due to swelling in her hands and feet. (Tr. 322). Dr. Vintimilla stopped the Lyrica and continued the Naproxen and Amitriptyline. (Tr. 323).

Plaintiff presented to Dr. Vintimilla on July 23, 2008, at which time Dr. Vintimilla noted that plaintiff had experienced side effects with every medication she had tried and was still in pain. (Tr. 319). Plaintiff also complained of severe diarrhea that was not going away. (Id.). Dr. Vintimilla's assessment was fibromyalgia and IBS. (Tr. 320). Dr. Vintimilla referred plaintiff to a pain center, noting that plaintiff had failed all of her therapies. (Id.).

_____

[15]Zanaflex is indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

[16]Lyrica is indicated for the treatment of fibromyalgia. See PDR at 2527.

[17]Omeprazole is indicated for the treatment of GERD. See PDR at 2177.

Plaintiff presented to Rustico Ramos, M.D. at Parkland Health Clinic on August 10, 2009. (Tr. 538). Dr. Ramos diagnosed plaintiff with fibromyalgia and IBS. (Id.). Dr. Ramos adjusted plaintiff's dosage of Venlafaxine[18] and added Gabapentin.[19] (Id.).

On September 8, 2009, plaintiff reported that the Venlafaxine made her "jittery," and the Gabapentin made her "feel funny." (Tr. 533). Dr. Ramos' impression was fibromyalgia with depressive component, denies suicidal ideation or intent. (Id.). Dr. Ramos stopped the Gabapentin and Venlafaxine, and prescribed Lamictal,[20] Amitriptyline, and Celebrex.[21] (Id.). Dr. Ramos recommended daily vigorous exercise, such as forty to sixty minutes of brisk walking. (Id.).

Plaintiff saw Dianna Moses-Nunley, Ph.D. for a psychological evaluation at the request of the state agency on September 10, 2009. (Tr. 495-98). Plaintiff complained of panic attacks, anxiety, and depression. (Tr. 495). Plaintiff reported that she had experienced problems with anxiety from approximately ten years of age. (Id.). Plaintiff indicated that she was sexually molested by multiple men on multiple occasions, and that she had recurrent thoughts, flashbacks, and nightmares about these events. (Id.). Plaintiff also reported lifelong depression. (Tr. 496). Upon mental status examination the following was noted: plaintiff seemed jittery, was verbose, related her ideas without difficulty in very spontaneous speech, her speech was of average quality

[18]Venlafaxine is an antidepressant indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 3196.

[19]Gabapentin is indicated for the treatment of nerve pain. See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

[20]Lamictal is indicated for the treatment of bipolar disorder. See PDR at 1490-91.

[21]Celebrex is indicated for the treatment of osteoarthritis. See PDR at 2981.

and above average quantity, she was coherent and logical, there were no abnormalities of thought content, plaintiff reported feeling anxious and depressed, and her affect was very anxious. (Tr. 496). Plaintiff's immediate memory was fair, her remote memory was adequate for her personal history and fair for national history, her insight and judgment were fair, her calculation was adequate, and her abstract reasoning skills were poor. (Tr. 496-97). Plaintiff described a lack of experience performing most functions of independent living, she reported that she only interacted with family, she was able to take care of her personal needs, and she reported poor concentration that causes her to work at a slow pace and fail to persist in difficult tasks. (Tr. 497). Dr. Moses-Nunley stated that plaintiff's described chronic psychological difficulties with anxiety are at least in part related to her history of unresolved and unaddressed childhood sexual abuse. (Id.). Dr. Moses-Nunley stated that these issues have a marked impact on plaintiff's thinking and social functioning so that her ability to function in most environments outside of the home is badly impaired. (Id.). She stated that plaintiff also experiences depressive symptoms that further hinder her functioning both in and outside of the home, and a pain disorder that is likely exacerbated by her anxiety and depression. (Id.). Dr. Moses-Nunley stated that plaintiff appeared to have very limited resources for coping with her medical and mental health problems and, without intervention, would likely continue to experience inability to maintain gainful employment so that she can live independently. (Id.). Dr. Moses-Nunley diagnosed plaintiff with post traumatic

stress disorder ("PTSD"),[22] panic disorder with agoraphobia,[23] major depressive disorder,[24] pain disorder associated with psychological factors and a generalized medical condition,[25] and a GAF of 61.[26] (Tr. 497-98). Dr. Moses-Nunley stated that plaintiff has moderate to marked impairment in her ability to do sustained work related activities in terms of both her ability to remember, comprehend, and carry out instructions; as well as her ability to maintain appropriate social functioning on the job. (Tr. 498).

Dr. Moses-Nunley also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which she expressed the opinion that plaintiff had marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with co-

---

[22]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's at 570.

[23]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open. Stedman's at 40.

[24]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[25]The essential feature of pain disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupational, or other important areas of functioning. The subtype Pain Disorder Associated with Both Psychological Factors and a General Medical Condition is used when both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

[26]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

workers, and respond appropriately to usual work situations and changes in a routine work setting. (Tr. 499-500). Dr. Moses-Nunley found that plaintiff had moderate limitations in her ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions, interact appropriately with the public, and interact appropriately with supervisors. (Id.). As support for these findings, Dr. Moses-Nunley stated that plaintiff reports that her ability to perform work tasks has been negatively affected by her anxiety and her ability to concentrate well enough to retain information seems compromised by her anxiety. (Tr. 499). Dr. Moses-Nunley also stated that plaintiff reported problems with co-workers and supervisors in previous jobs that have prevented her from performing her duties. (Tr. 500).

Plaintiff presented to Dr. Ramos on November 25, 2009, at which time plaintiff complained of chronic neck pain, migraine headaches occurring three times a week, and difficulty sleeping. (Tr. 525). Plaintiff stated that she "tries" to exercise, but admitted that she did not have a regular exercise routine. (Id.). Upon examination, Dr. Ramos noted at least eighteen trigger points. (Id.). Dr. Ramos also noted that plaintiff's affect was flat and her speech was monotone. (Tr. 526). Dr. Ramos diagnosed plaintiff with chronic recurrent neck pain, fibromyalgia, insomnia, migraine headache, and depressed affect. (Tr. 525-26). Dr. Ramos recommended a neuropsychiatric evaluation, physical therapy, and x-rays. (Id.). Dr. Ramos encouraged "ownership" of plaintiff's condition, including healthy lifestyle interventions, and daily exercise. (Tr. 526).

On December 11, 2009, Dr. Ramos noted that plaintiff had begun walking thirty minutes daily at Wal-Mart, and her diet was healthy. (Tr. 522). Upon examination, plaintiff was pleasant

and ambulatory. (Id.). Plaintiff had undergone x-rays of the cervical, thoracic, and lumbar spine, which were unremarkable. (Id.). Dr. Ramos' impression was fibromyalgia. (Id.). Dr. Ramos started plaintiff on Savella.[27] (Id.).

On December 28, 2009, Dr. Ramos indicated that plaintiff was intolerant to Savella. (Tr. 506). Upon examination, plaintiff was fibromyalgic, her speech was monotone, and her affect and mood were somewhat flat. (Id.). Dr. Ramos prescribed generic Venlafaxine for plaintiff's fibromyalgia. (Id.).

Plaintiff presented to Dr. Ramos on February 5, 2010, at which time Dr. Ramos stated that plaintiff complained of thirteen symptoms in a five-minute period, was very focused on symptomatology, and jumped to new symptoms when the examiner attempted to get more details about any specific symptoms. (Tr. 573). Plaintiff answered positive to all twenty-five items asked on a Report of Symptoms ("ROS") list, which was "difficult to ascribe/correlate." (Id.). Dr. Ramos noted that plaintiff's speech was monotone. (Id.). Dr. Ramos' impression was multiple symptoms, difficult to assess patient's history; GERD; and fibromyalgia. (Id.). Dr. Ramos adjusted plaintiff's dosage of Venlafaxine, and ordered a cardiolite stress test. (Id.).

On February 19, 2010, plaintiff again reported "multiple complaints that have been difficult to ascribe/correlate with any specific condition." (Tr. 572). Dr. Ramos indicated that plaintiff's cardiolite stress test was normal. (Id.). Dr. Ramos noted that plaintiff had failed migraine and headache treatments and her headaches persist. (Id.). Dr. Ramos stated that plaintiff has a tentative diagnosis of depression/fibromyalgia, but her symptoms had been

---

[27]Savella is an antidepressant indicated for the treatment of fibromyalgia. See WebMD, http://www.webmd.com/drugs (last visited June 14, 2013).

recalcitrant to trials of Savella and Cymbalta. (Id.). Upon examination, plaintiff was ambulatory.

(Id.). Plaintiff's affect was improved, although it was still flat and congruent with her mood.

(Id.). Dr. Ramos continued the Venlafaxine, and stated that it has improved her overall mood

even if it had not resolved her "multiple difficult symptomatology." (Id.).

> On March 19, 2010, Dr. Ramos stated the following:
>
> This is a generally friendly 47 year old who is applying for social security disability. She has a diagnosis of fibromyalgia, intermittent functional headaches and irritable bowel syndrome. She has a persistently negative affect leading to a behavioral pattern of invalidism and helplessness.
>
> So far, her medical treatment [] included antidepressant medication: Venlafaxine 150mg bid and encouragement of healthy diet, regular exercise and good sleep. Although she is applying for disability, in my professional opinion, I believe that she would actually do better and benefit from a low physical impact, intellectually engaging employment that she could attend 8 hours a day up to 40 hours a week. Her mental capacity is intact with eloquent speech/expression. I do not think, however, that she could maintain a physically laborious occupation. Most of her stressors are related to family issues and low income. An occupation where she could interact and engage meaningfully with others while earning a decent wage/pay would be beneficial to her overall health. More beneficial, I think, than full disability which in my professional opinion may exacerbate her symptomatology and helplessness. With a decent wage and/or health insurance, she may be able to afford counseling and cognitive behavioral therapy leading to an improved long term outcome and health.

(Tr. 571).

Dr. Ramos also completed a Physician's Assessment for Social Security Disability Claim,

in which he indicated that plaintiff had no cognitive restrictions. (Tr. 570). In response to a

question on the form asking whether plaintiff was capable of performing sedentary work, Dr.

Ramos stated "sedentary occupation is acceptable." (Id.).

Plaintiff saw Stanley London, M.D. on May 18, 2010, for an orthopedic evaluation. (Tr.

576-77). Plaintiff complained of neck and back pain that had been present for about thirteen

years. (Tr. 576). Dr. London noted that plaintiff was not an accurate historian and had trouble

remembering any particular details. (Tr. 577). Upon examination, plaintiff's gait was fairly normal, she was able to heel and toe walk, she was unable to hop, she was able to squat, and she got off and on the table without a great deal of difficulty. (Id.). Plaintiff's straight leg raise was sixty degrees producing some back pain, her neck motion was somewhat restricted in all areas, and she was tender to touch along the paravertebral muscles in her back and at the base of her neck. (Id.). Plaintiff underwent x-rays of the lumbosacral spine, which revealed degenerative joint disease[28] with some degenerative disc disease.[29] (Id.). Dr. London's impression was low back pain, neck pain, and degenerative joint disease. (Tr. 577).

Dr. London completed a Medical Report Including Physician's Certification/Disability Evaluation in connection with plaintiff's Medicaid application, in which he expressed the opinion that plaintiff was disabled for three to five months. (Tr. 580).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2004.

2.      The claimant has not engaged in substantial gainful activity since September 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: fibromyalgia, irritable bowel syndrome (IBS), and migraine headaches. Depression, post traumatic stress, and

---

[28]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[29]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

an anxiety/panic disorder are nonsevere as they result in no more than slight if any limitation in function (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.    The claimant is capable of performing past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2004, through the date of this decision (20 CFR 404.1520(f and 416.920(f)).

(Tr. 14-20).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on February 27, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on February 27, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

# Discussion

## A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial

gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age,

education and work experience of a claimant are not considered in making the "severity"

determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See

20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled. See id. If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if

s/he is not able to perform any other work. See id. Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges

from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ failed to fully and fairly develop the evidence.  Plaintiff next argues that the ALJ failed to properly consider the opinion evidence.  Plaintiff finally argues that the ALJ failed to properly consider all of plaintiff's severe medically determinable impairments at step two.  The undersigned will discuss plaintiff's claims in turn.

**1.      Duty to Develop the Record**

Plaintiff argues that the ALJ failed to fully and fairly develop the evidence.

"The ALJ's duty to develop the record exists independent of the claimant's burden in the case."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  This duty includes the ordering of a consultative examination when such an evaluation is necessary for an informed decision.  Haley v. Massanari, 258 F.3d 742, 749 (8th Cir.2001).  The ALJ need not order a consultative examination if the record contains substantial evidence to support the ALJ's decision.  Id.

In support of this claim, plaintiff argues generally that "there was no indication that the ALJ investigated or considered arguments **for** granting benefits." (Doc. No. 15, p. 6) (emphasis in original). Plaintiff has not indicated specifically how the ALJ failed to develop the record. Plaintiff underwent a consultative psychological evaluation (Tr. 495-98), a consultative orthopedic evaluation (Tr. 576-77), and her treating physician completed an assessment in connection with her claim (Tr. 570-71). The record contains sufficient evidence from which the ALJ could make a determination.

Thus, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 2.     Medical Opinion Evidence

Plaintiff contends that the ALJ erred in evaluating the opinions of Dr. Vintimilla, the state agency opinions, Dr. London, Dr. Moses-Nunley, and Dr. Ramos. Plaintiff also challenges the ALJ's RFC determination.

## I.     Dr. Vintimilla

Plaintiff argues that, although the ALJ indicated that he was giving "greater weight" to the opinion of Dr. Vintimilla, Dr. Vintimilla did not assess any functional limitations. Plaintiff contends that it is, therefore, unclear to what opinion that ALJ was referring.

Dr. Vintimilla treated plaintiff for her physical complaints from October 2007 through July 2008. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-

2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. <u>Goetz v. Barnhart</u>, 182 F. App'x 625, 626 (8th Cir. 2006).

The ALJ summarized Dr. Vintimilla's treatment notes, and emphasized the following findings: Dr. Vintimilla indicated that plaintiff's panic disorder was "inactive," and she recommended that plaintiff engage in aerobic exercise. (Tr. 16-18). The regulations define "medical opinions" as "statements from physicians and psychologists...that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2).

Dr. Vintimilla's finding that plaintiff's panic disorder was inactive reflected her judgment about the severity of her mental impairment. Similarly, Dr. Vintimilla's statement that plaintiff should engage in aerobic exercise reflected her judgment about what plaintiff was able to do despite her physical impairments. Thus, the ALJ did not err in assigning "great weight" to these opinions of plaintiff's treating physician.

**ii.     State Agency Opinions**

Plaintiff argues that the ALJ erred in evaluating the opinions of state agency psychologist Dr. Singer, and the single decision-maker.

In March 2009, Dr. Singer expressed the opinion that plaintiff did not have a severe mental impairment. (Tr. 307-17). The ALJ indicated that he was assigning "greater weight" to

the opinion of Dr. Singer, "in combination" with the opinions of Drs. Ramos and Vintimilla. (Tr. 18). Plaintiff contends that the ALJ erred in considering Dr. Singer's opinion because it predated much of the medical evidence of record and did not provide substantial evidence to support the ALJ's decision.

"Because nonexamining sources have no examining or treating relationship with [claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3). Further, under the regulations, "when evaluating a nonexamining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'" Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(3)).

It is true that Dr. Singer's opinion predated a significant amount of the medical evidence. As defendant points out, however, plaintiff alleged a disability onset date of September 1, 2004, and plaintiff's insured status expired on December 31, 2004 for purposes of her Title II claim. (Tr. 14). Consequently, Dr. Singer's opinion that plaintiff did not have a severe mental impairment between September 2004 and March 2009 is highly relevant to plaintiff's claims.

Further, the ALJ did not indicate that he was relying on Dr. Singer's opinion. Rather, he stated that he was considering Dr. Singer's opinion in combination with the opinions of treating physicians Drs. Ramos and Vintimilla. As will be discussed in more detail below, Dr. Singer's opinion that plaintiff did not have a severe mental impairment is consistent with the opinion of Dr. Ramos. Thus, the ALJ did not err in evaluating Dr. Singer's opinion.

Plaintiff also contends that the ALJ erred in considering the opinion of the Physical Residual Functional Capacity Assessment of single decision-maker[30] Dawn Horrell. (Tr. 301-06). Plaintiff argues that it is unclear whether the ALJ recognized that this assessment was completed by a non-physician.

"An ALJ may rely upon the opinion of a nontreating or consultative 'medical source,' but he may not give the same weight to the opinion of a nonmedical, or lay, state agency evaluator." Williams v. Astrue, 4:11CV57 AGF, 2012 WL 946806, * 9 (E.D. Mo. Mar. 20, 2012). A single decisionmaker is not considered a medical source. See Gaston v. Astrue, 2012 WL 3045685, *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decisionmaker" as "single decisionmaker" was a disability counselor and not an acceptable medical source as defined by the regulations). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ evaluated the opinion of a lay person as a medical expert).

The ALJ noted that "DDS" determined that plaintiff could perform light work, and that this finding was consistent with the record at that time. (Tr. 17). The ALJ did not, however, assign this opinion any weight. In addition, there is no indication that the ALJ believed this opinion was authored by a physician. In fact, the ALJ distinguished between the "DDS" opinion and the "State agency psychologist." (Tr. 17). Further, the opinion of the single decision-maker

---

[30]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also Shackleford v. Astrue, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

was slightly different from the RFC found by the ALJ. The ALJ did not rely on the opinion of the single decision-maker in determining plaintiff's RFC. Rather, as will be discussed below, the RFC determined by the ALJ was based on the record as a whole.

Thus, the ALJ did not err in evaluating the opinion of the single decision-maker.

### iii.    Dr. London

Plaintiff argues that the ALJ erred in stating that Dr. London "places no specific restrictions on the claimant's activities and never opines that she is disabled [or] unable to work." (Tr. 17). Plaintiff contends Dr. London was never asked to render an opinion regarding plaintiff's specific restrictions, and that Dr. London did find that plaintiff was disabled.

Plaintiff saw Dr. London for a consultative orthopedic examination on May 18, 2010. (Tr. 576-77). Dr. London completed a report in connection with plaintiff's Medicaid application, in which he expressed the opinion that plaintiff was disabled for three to four months. (Tr. 580).

The ALJ accurately noted that Dr. London found some objective basis for plaintiff's pain, but found no impairment in gait or station, no loss of muscle or motor strength, and no neurological deficit. (Tr. 17, 577). Despite plaintiff's contention that Dr. London was never asked to render an opinion regarding plaintiff's specific restrictions, the form Dr. London completed asked for limitations of motion, such as plaintiff's ability to walk, stand, bend, and stoop. (Tr. 580). Dr. London did not complete this section of the form. (Id.). The ALJ also properly pointed out that Dr. London did not express the opinion that plaintiff was disabled. Dr. London found only that plaintiff was unable to work for three to five months, which is inconsistent with the SSA's definition of disability.

Thus, the ALJ did not err in evaluating the opinion of Dr. London.

### iv. Dr. Moses-Nunley

Plaintiff argues that the ALJ erred in assigning "no significant weight" to the opinion of Dr. Moses-Nunley due to inconsistencies.

Plaintiff saw Dr. Moses-Nunley for a consultative psychological evaluation on September 10, 2009. (Tr. 495-98). Dr. Moses-Nunley completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which she expressed the opinion that plaintiff had either marked or moderate limitations in all areas. (Tr. 499-500).

The ALJ stated that he was assigning "no significant weight" to Dr. Moses-Nunley's mental capacity assessment, as it contradicts her narrative report wherein she notes no deficit in memory and judgment, insight and ability to solve mathematical equations, and a GAF score of 61. (Tr. 18, 496-97). The ALJ also found that Dr. Moses-Nunley's assessment was inconsistent with the findings and opinions of Drs. Ramos, Vintimilla, and Singer. (Tr. 18).

The undersigned finds that the ALJ provided sufficient reasons for assigning little weight to Dr. Moses-Nunley's opinion. The ALJ properly pointed out that her assessment was inconsistent with her narrative report, particularly Dr. Moses-Nunley's GAF score of 61. (Tr. 498). It is also notable that, as support for her opinions, Dr. Moses-Nunley cited plaintiff's reports regarding her limitations rather than any findings on examination. (Tr. 499-500). An ALJ is entitled to give less weight to a medical opinion when it is based largely on subjective complaints, rather than on objective medical evidence or when the physician's notes are inconsistent with the RFC assessment. Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).

The ALJ also pointed out that Dr. Moses-Nunley's opinions were inconsistent with the record, including the opinion of treating physician Dr. Ramos. Significantly, Dr. Ramos found

that plaintiff had no mental limitations. (Tr. 570-71). The ALJ acknowledged Dr. Moses-Nunley's greater expertise in mental healthcare, but found that this expertise did not undermine the findings of Dr. Ramos when Dr. Ramos examined plaintiff on many occasions over a significant period of time. (Tr. 18).

The ALJ properly assigned less weight to the opinion of Dr. Moses-Nunley, who only examined plaintiff on one occasion. It is well settled that the report of a consulting physician who has seen the claimant only once is of little significance by itself. See Browing v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); Turpin v. Bowen, 813 F.2d 165, 170 (8th Cir. 1987) ("The report of a consulting physician who examines a claimant once does not constitute 'substantial evidence' upon the record as a whole.'").

Thus, the ALJ did not err in evaluating the opinion of Dr. Moses-Nunley.

**v.    Dr. Ramos**

Plaintiff first argues that the ALJ erred in finding that plaintiff was capable of performing light work when Dr. Ramos limited plaintiff to sedentary work. Dr. Ramos did not, however, limit plaintiff to performing only sedentary work. Dr. Ramos completed a Physician's Assessment for Social Security Disability Claim, in which it was asked whether plaintiff was capable of performing sedentary work. (Tr. 570). Dr. Ramos responded "sedentary occupation is acceptable." (Id.). The form did not identify the requirements of light work or ask whether plaintiff was capable of performing light work.

In his treatment notes dated the same as his assessment, Dr. Ramos stated that plaintiff would benefit from a "low physical impact" job, which is not "physically laborious." (Tr. 571). In September 2009, Dr. Ramos recommended "daily vigorous exercise." (Tr. 533). In December

2009, Dr. Ramos noted that plaintiff had begun walking thirty minutes daily at Wal-Mart. (Tr. 522). Upon examination, plaintiff was pleasant and ambulatory. (Id.). On February 19, 2010, Dr. Ramos noted on examination that plaintiff was ambulatory. (Tr. 572). Although Dr. Ramos did not specifically state that plaintiff was capable of performing light work, his treatment notes and opinions are consistent with the performance of light work.

Plaintiff next argues that the ALJ erred in evaluating Dr. Ramos' opinion regarding plaintiff's mental limitations. Plaintiff takes issue with the ALJ's statement that Dr. Ramos "believes [plaintiff]'s mental capacity is intact." (Tr. 17). Plaintiff contends that Dr. Ramos gave no indication that he understood the requirements to qualify for Social Security disability, and that he did not provide any specific functional mental limitations. Plaintiff's argument lacks merit. The assessment form Dr. Ramos completed specifically asked whether plaintiff had any limitations in her ability to maintain attention/concentration, be reliable in a day in and day out basis, make work related decisions, respond appropriately to supervisors and coworkers, and deal with work stress. (Tr. 570). Dr. Ramos stated that plaintiff had no such limitations. (Id.).

The ALJ properly evaluated the opinion of Dr. Ramos regarding plaintiff's mental limitations. Dr. Ramos was plaintiff's treating physician and saw plaintiff regularly beginning in August 2009 for treatment of her various complaints. Dr. Ramos diagnosed plaintiff with fibromyalgia and prescribed multiple medications to treat this condition. (Tr. 538, 533, 525, 522, 506).

As plaintiff points out, Dr. Ramos noted on some examinations that plaintiff's affect was depressed or flat, or that her speech was monotone. (Tr. 526, 506, 573). In February 2010, Dr. Ramos noted that plaintiff had complained of multiple symptoms, did not provide details about

each symptoms, and answered positive to all twenty-five items asked on a Report of Symptoms. (Tr. 573). Dr. Ramos described plaintiff's symptoms as "difficult to ascribe/correlate." (Id.). Later in February, Dr. Ramos again noted that plaintiff reported "multiple complaints that have been difficult to ascribe/correlate with any specific condition." (Tr. 572). Dr. Ramos indicated that plaintiff had a tentative diagnosis of depression/fibromyalgia, but her symptoms had been recalcitrant to trials of Savella and Cymbalta. (Id.). Plaintiff's affect was "improved," although it was still flat and congruent with her mood. (Id.). Dr. Ramos indicated that plaintiff's overall mood had improved with medication, even if her "multiple difficult symptomatology" had not resolved. (Id.). On March 19, 2010, Dr. Ramos stated that plaintiff had a persistently negative affect leading to a behavioral pattern of invalidism and helplessness. (Tr. 571). Dr. Ramos expressed the opinion that, while plaintiff was applying for disability, she would "do better and benefit from a low physical impact, intellectually engaging employment that she could attend 8 hours a day up to 40 hours a week." (Id.). Dr. Ramos found that plaintiff's mental capacity was "intact." (Id.). Dr. Ramos noted that most of plaintiff's stressors were "related to family issues and low income." (Id.). Dr. Ramos continued that an occupation "where she could interact and engage meaningfully with others while earning a decent wage/pay would be beneficial to her overall health," and that disability may "exacerbate her symptomatology and helplessness." (Id.). Dr. Ramos stated that, with "a decent wage and/or health insurance," plaintiff "may be able to afford counseling and cognitive behavioral therapy leading to an improved long term outcome and health." (Id.).

Dr. Ramos' opinions regarding plaintiff's mental impairments are consistent with his treatment notes. While Dr. Ramos did note some abnormal findings regarding plaintiff's affect

and speech at times, he also noted plaintiff was "pleasant," and that her mood improved with medication.  (Tr. 522, 572).  The ALJ noted that Dr. Ramos' opinion suggests that he believed plaintiff was exaggerating her symptoms.  (Tr. 18).  This finding is supported by Dr. Ramos' treatment notes, in which he indicates on two occasions that plaintiff reported multiple complaints that were difficult to ascribe or correlate.  (Tr. 573, 572).  In fact, as defendant points out, plaintiff admitted at the hearing that Dr. Ramos accused her of drug-seeking behavior.  (Tr. 53).  Dr. Ramos' opinions that plaintiff has no mental limitations, and that she was capable of working are consistent with his treatment notes.  Thus, the ALJ did not err in finding that Dr. Ramos' opinions were entitled to great weight.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In determining plaintiff's RFC, the ALJ properly assessed the credibility of plaintiff's subjective complaints under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The ALJ considered that plaintiff's treatment had been sporadic. (Tr. 18). The failure to seek regular medical treatment detracts against a claimant's credibility. See Casey, 503 F.3d at 693. Despite alleging a disability onset date of September 1, 2004, there is no record of treatment until August 2005, after plaintiff's last insured date. (Tr. 338). Plaintiff's next record of treatment is not until October 2007. (Tr. 291). In addition, despite alleging a disabling mental impairment, plaintiff never sought treatment from a mental health professional. Plaintiff's lack of treatment significantly detracts from her disability. Further, although plaintiff testified that she did not receive treatment due to financial difficulty, the ALJ noted that plaintiff did not lose her Medicaid coverage until March 2010. (Tr. 18, 65).

The ALJ discussed plaintiff's work history and earnings. (Tr. 18). The ALJ stated that, based on plaintiff's work history, plaintiff did not appear particularly work motivated. (Id.). The ALJ properly found that plaintiff's poor work history detracted from her credibility. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate lack of motivation to work rather than a lack of ability.").

The ALJ discussed plaintiff's daily activities. (Tr. 18-19). The ALJ noted that the medical record reveals plaintiff walked daily at Wal-Mart, which is inconsistent with her claims of

disabling pain. (Tr. 18, 522). Significant daily activities may be inconsistent with claims of disabling pain. See Haley, 258 F.3d at 748.

Finally, the ALJ found that the objective medical evidence did not support plaintiff's claims. (Tr. 18-19). The ALJ pointed out that objective testing, such as x-rays and other studies, have typically been negative; and plaintiff has never required hospitalization, emergency care, or surgery for her symptoms. (Tr. 19, 343, 288, 522, 572). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ's RFC determination is supported by substantial evidence on the record as a whole. The ALJ performed a proper credibility analysis and found that plaintiff's complaints were not entirely credible. The ALJ also properly evaluated the medical opinion evidence. Significantly, plaintiff's treating physician Dr. Ramos found that plaintiff had no mental limitations and was capable of performing "low physical impact, intellectually engaging employment" eight hours a day up to forty hours a week. (Tr. 571). Dr. Ramos' opinion is consistent with the performance of the full range of light work.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 3.      Step Two Determination

Plaintiff finally argues that the ALJ erred in failing to find plaintiff's pain disorder and other mental impairments severe at step two of the sequential evaluation.

A severe impairment is defined as an impairment that significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby, 500 F.3d at 707-08.

Plaintiff's argument is based on the findings of Dr. Moses-Nunley. Dr. Moses-Nunley diagnosed plaintiff with PTSD, panic disorder with agoraphobia, major depressive disorder, and pain disorder associated with psychological factors and a generalized medical condition. (Tr. 497-98).

As discussed above, the ALJ properly found that Dr. Moses-Nunley's opinion was not entitled to significant weight. Dr. Nunley's opinion was inconsistent with her own report, particularly her assessed GAF score of 61, and the other medical evidence of record. The ALJ's finding that plaintiff's mental impairments were not severe is supported by the opinion of treating physician Dr. Ramos and state agency psychologist Dr. Singer. Thus, the ALJ's step two determination is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's application for benefits be affirmed.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying

plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act

and Supplemental Security Income under Title XVI of the Act be **affirmed**.


     The parties are advised that they have fourteen days in which to file written objections to

this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the

right to appeal questions of fact.


Dated this 18th   day of July, 2013.


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE